[No. B046516. Second Dist., Div. One. Dec. 13, 1990.]

CARL A. SCHWARZ, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions directed to be published follow.

COUNSEL

Sharon Green for Plaintiff and Appellant.

Bonne, Jones, Bridges, Mueller & O'Keefe, Peter R. Osinoff, Greines, Martin, Stein & Richland, Martin Stein and Roxanne Huddleston for Defendants and Respondents.

OPINION

SPENCER, P. J.—

## INTRODUCTION

Plaintiff Carl A. Schwarz appeals from a judgment of dismissal entered after the trial court sustained without leave to amend the demurrer to the second amended complaint.

## STATEMENT OF FACTS

In June 1982, plaintiff's son, Marlon, began therapy in the child outpatient department of the UCLA Medical Center Neuropsychiatric Institute.

Marlon's primary problem was enuresis, or bedwetting. The treating therapist also noted that Marlon suffered from an adjustment disorder, and there was considerable family stress due to the parents' bitter divorce. Plaintiff agreed to pay for this therapy with the hope of improving Marlon's relationships with his parents. Marlon's parents had joint legal and physical custody of him, but at one point in his therapy the therapist informed the parents that joint physical custody was not in Marlon's best interests. At the recommendation of the therapist, plaintiff allowed Marlon to live solely with his mother.

Periodically in the course of Marlon's therapy, his parents met with his therapist, either jointly or singly, to assist in Marlon's therapy. In addition, plaintiff agreed to undergo individual psychotherapy. In July 1984, Marlon's therapy was assigned to Dr. James Sparing; Dr. Sparing treated Marlon for the next year. Shortly after Marlon began therapy with Dr. Sparing, plaintiff asked for a reevaluation of Marlon's living arrangements. After meeting with both of Marlon's parents, Dr. Sparing recommended that no change be made, and none was made.

At some time in July 1985, Marlon's mother advised Dr. Sparing that she was moving with Marlon to London in an effort to free them from plaintiff's harassment; she did not wish plaintiff to know their whereabouts. Dr. Sparing counselled, aided, encouraged, assisted and facilitated Marlon's mother in implementing her plan to remove Marlon from the country and conceal his whereabouts from plaintiff. He similarly counselled Marlon that this was the "thing to do." Dr. Sparing discussed the move with Marlon; although Marlon had some ambivalence about the move, he believed it was the best thing to do. He was, however, concerned about having to lie to his father to prevent him from learning about the move.

After a prolonged search, plaintiff learned in March 1987 that Marlon was residing in England. Thereafter, plaintiff unsuccessfully attempted to gain custody of Marlon. During these proceedings, plaintiff learned Dr. Sparing had been aware of the planned move to England. Dr. Sparing knew Marlon's parents had joint physical and legal custody of him, but had deliberately concealed his knowledge of Marlon's whereabouts.

When plaintiff discovered Dr. Sparing's role, he was shocked and anguished. By assisting in the removal of Marlon from California, Dr. Sparing disrupted the family relationships. As a consequence, plaintiff suffered severe emotional injuries.

CONTENTIONS

I

Plaintiff contends the trial court erred in sustaining his demurrer without leave to amend, in that he has alleged facts sufficient to state a cause of action for the negligent infliction of emotional distress.

II-IV*

. . . . . . . . . . . . . . . . . . . . . . .

DISCUSSION

■ In reviewing an order sustaining a demurrer, all material facts pleaded in the complaint and those which arise by reasonable implication are deemed true. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 828 [122 Cal.Rptr. 745, 537 P.2d 865].) A demurrer should *not* be sustained without leave to amend if the complaint, liberally construed, can state a cause of action under any theory or if there is a reasonable possibility the defect in the complaint can be cured by amendment. (*Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113, 118 [113 Cal.Rptr. 102, 520 P.2d 726]; *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 103 [101 Cal.Rptr. 745, 496 P.2d 817]; *Kite* v. *Campbell* (1983) 142 Cal.App.3d 793, 804 [191 Cal.Rptr. 363].) The demurrer should be sustained and leave to amend denied only "where the facts are not in dispute, and the nature of the plaintiff's claim is clear, but, under the substantive law, no liability exists. Obviously no amendment would change the result." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 945, p. 379.)

I

Plaintiff contends the trial court erred in sustaining his demurrer without leave to amend, in that he has alleged facts sufficient to state a cause of action for the negligent infliction of emotional distress. We disagree.

■ There is no independent action for the negligent infliction of emotional distress; it is simply one species of negligence. (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278].) Thus, to state a cause of action, the facts alleged must show a legal duty of care, its breach, causation and resulting

* See footnote, *ante,* page 149.

injury. (*Ibid.*) " 'Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against imposition of liability.' [Citation.]" (*Ibid.*)

*Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] enunciated a then-novel negligence theory permitting the recovery of damages when the plaintiff had suffered no physical injury in the usual sense, but had, as a consequence of observing the injury of a third person through the negligent acts of another, suffered emotional distress sufficiently severe that its physical manifestations were observable. In *Dillon,* the court considered the reasonable foreseeability that the plaintiff would suffer such emotional distress to be the primary factor in determining whether the defendant owed a duty of care to the plaintiff. (*Id.* at p. 740.) To meet various policy concerns implicated in imposing a duty of care in such circumstances, the court established three general guidelines for assessing the foreseeability of purely emotional injury, based on the facts before it. The court considered the following factors to be of high importance: (1) whether the plaintiff was located at or near the scene of the accident, (2) whether the victim and the plaintiff are closely related, and (3) whether the shock resulted from the direct emotional impact on the plaintiff from the sensory and contemporaneous observation of the injury to the victim. (*Id.* at pp. 740-741.)

Over the years, the theory expanded to suggest the plaintiff need not directly and visually observe the event which results in injury or death to the victim, but may sensorily perceive the fact of injury in other ways. (See, e.g., *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 76 [137 Cal.Rptr. 863, 562 P.2d 1022]; but see *Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 523 [150 Cal.Rptr. 1, 585 P.2d 851].) For some time, however, the courts held to the belief that the defendant's conduct must result in an "accident," i.e., a sudden and brief occurrence. This limitation fell by the wayside in *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1]. In *Ochoa,* the Supreme Court expressly rejected such a limitation, permitting a claim for emotional distress suffered upon observing the defendants' medical neglect of the plaintiff's son and his consequent, but rather gradual, deterioration. The court stated: "[W]hen there is observation of the defendant's conduct and the child's injury and contemporaneous awareness the defendant's conduct or lack thereof is causing the harm to the child, recovery is permitted." (*Id.* at p. 170.)

In the interim, *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] appeared to develop a parallel theory of recovery on the basis that the plaintiff was a

"direct victim" of the defendant's negligence. In *Molien*, the Supreme Court held the defendants owed a duty directly to the husband of the patient as a result of misdiagnosing the wife as suffering from a sexually transmitted disease, directing the wife to so inform her husband and to have him come in for examination. On these facts, the court reasoned it not only was foreseeable that the husband would suffer emotional distress, but the defendants' conduct actually was directed at the husband as well as the wife patient. (*Id.* at p. 923.) The court drew an express distinction between the status of the plaintiff in *Dillon* v. *Legg, supra,* 68 Cal.2d 728, who suffered injury solely from witnessing the infliction of injury on her child and thus was a "bystander," and the status of the husband as a "direct victim." (*Molien, supra,* 27 Cal.3d at p. 923.)

After the decision in *Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916, the imposition of a duty of care under the theory developed in that case was defined as arising when "the defendant's negligence is foreseeably *directed* toward the person asserting a claim for emotional distress." (*Kately* v. *Wilkinson* (1983) 148 Cal.App.3d 576, 587 [195 Cal.Rptr. 902], italics added.) While the Supreme Court seemed to deemphasize the defendant's intent in favor of emphasizing the foreseeability of the emotional injury in *Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063], in which the court held a young child was a direct victim of a therapist's negligent failure to warn the mother of a patient's threat of injury to her, it took a different approach in *Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159. In *Ochoa*, the court held the parents were not direct victims of negligent acts in the treatment of their son, stating this theory of recovery is limited to those situations in which the defendant's negligence is "by its very nature directed at," i.e., intended to affect, the plaintiff. (*Id.* at p. 172.) After stressing the limiting factors considered dispositive in *Molien*, the court stated: "By contrast, here the defendants' negligence . . . was directed primarily at the decedent, with Mrs. Ochoa looking on as a helpless bystander as the tragedy of her son's demise unfolded before her." (39 Cal.3d at pp. 172-173.)

The Supreme Court has since revisited both of these theories, twice in the same month, first in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d 583 and then again in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814]. In *Marlene F.*, the court characterizes *Dillon* v. *Legg, supra,* 68 Cal.2d 728 as "[r]ecognizing that foreseeability of the injury was but the *threshold* element in determining the existence of a duty of care." (48 Cal.3d at p. 589, italics added.) Consequently, in *Dillon*, the court "identified a number of factors designed to limit the scope of the duty to 'exclud[e] the remote and unexpected' and to specify the class

of potential plaintiffs entitled to recover for the emotional distress occasioned by witnessing the injury of another. [Citation.]" (*Ibid.*)

Turning its attention to the theory developed in *Molien v. Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916, the court notes: "As in *Dillon v. Legg, supra,* 68 Cal.2d 728, we stressed certain inherently limiting factors, in particular that the doctor instructed the wife to tell her husband of the diagnosis and to advise him to be examined as well, and that the doctor's error was singularly likely to result in marital discord and in emotional distress to the husband," in that the particular disease at issue " 'is normally transmitted only by sexual relations . . . .' " (*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at p. 589.)

The court continues: "Our decision [in *Molien v. Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916] did not, however, purport to create a cause of action for the negligent infliction of emotional distress based solely upon the foreseeability that serious emotional distress might result. It is plainly foreseeable, for example, that close family members of a patient would suffer severe emotional distress if told the patient had been diagnosed as suffering from a terminal illness, but without more, the patient's physician would not be liable for that distress whether or not the diagnosis was erroneous. [Citation.] Damages for severe emotional distress, rather, are recoverable in a negligence action when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two. [In *Molien,*] . . . [b]y directing the husband be told of a diagnosis that foreseeably would disrupt the marital relationship and require the husband to be physically examined, the doctor assumed a duty to convey accurate information and the husband accordingly was a 'direct victim' of the doctor's negligence." (*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at pp. 589-590, fn. omitted.) The court then concludes the case before it permits recovery on a "direct victim" theory. (*Id.* at pp. 590-591.)

The Supreme Court's later analysis of the "bystander" and "direct victim" theories of recovery in *Thing v. La Chusa, supra,* 48 Cal.3d 644 is more harsh. After discussing a post-*Dillon* "expansive progression" in the imposition of liability (at pp. 656-657), the court characterizes *Molien* as eliminating "[b]oth the physical harm and accident or sudden occurrence elements . . . , at least as to those plaintiffs who could claim to be 'direct victims' of the defendant's negligence . . . . [¶] In finding the existence of a duty to the husband of the patient, the court [in *Molien*] reasoned that the risk of harm to the husband was reasonably foreseeable, and that the tortious conduct was directed to him as well as the patient. [Citation.] The status of the plaintiff mother in *Dillon* was distinguished as she suffered her

injury solely as a 'percipient witness' to the infliction of injury on another. She was therefore a 'bystander' rather than a 'direct victim.'" (*Thing, supra,* at p. 658.)

Notwithstanding an apparently clear understanding of the distinct basis underlying a "direct victim" theory of recovery, enunciated and followed in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at pages 589-591, the Supreme Court expresses a different view entirely in *Thing* v. *La Chusa, supra,* stating the court in *Molien* "did not further explain this distinction [between 'bystanders' and 'direct victims'], or its relevance . . . . Both [*Dillon* and *Molien*] had looked to the relationships of the parties to find foreseeability of the injury and thus a 'duty to the plaintiff.' . . . *Molien* neither established criteria for characterizing a plaintiff as a 'direct' victim, nor explained the justification for permitting 'direct' victims to recover when 'bystander' plaintiffs could not. The immediate effect of the decision, however, was to permit some persons who had no prior relationship with the defendant that gave rise to a duty, who did not suffer physical injury as a result of emotional distress, who did not observe the negligent conduct, and who had not been at or near the scene of the negligent act to recover for emotional distress on a pure foreseeability-of-the-injury basis. The limitations on recovery for emotional distress that had been suggested in the *Dillon* 'guidelines' were not applicable to 'direct' victims of a defendant's negligence." (48 Cal.3d at pp. 658-659.)

The court then notes that "[t]he subtleties in the distinction between the right to recover as a 'bystander' and as a 'direct victim' created what one Court of Appeal has described as an 'amorphous nether realm' [citations], and have contributed in some measure to the present difficulty in defining the scope of [a negligence action based on a third party's emotional distress]. In [one case], the court . . . abandoned the effort to resolve the 'direct' or 'bystander' dilemma: 'The problem which arises from this cryptic explanation is: how are we to distinguish between "direct victim" cases and "bystander" cases? . . . The inference suggested is that a "direct victim" is a person whose emotional distress is a reasonably foreseeable consequence of the conduct of the defendant. This does not provide criteria . . . [but] leads into the quagmire of novel claims which the Supreme Court foresaw as an unacceptable consequence of a "pure" foreseeability analysis . . . .' [Citation.] [¶] '[F]oreseeability,' the court noted later . . . , 'is endless because foreseeability, like light, travels indefinitely in a vacuum.' *Molien* . . . , thus, left to future cases the 'unenviable tasks of distinguishing bystander from direct victim cases and establishing limits for the latter . . . with a "foreseeable" diversity of results.' [Citation.]" (*Thing* v. *La Chusa, supra,* 48 Cal.3d at p. 659, citation omitted, fn. omitted.)

The court next turns its attention to *Ochoa* v. *Superior Court, supra*, 39 Cal.3d 159, stating that case "partially explained and limited 'direct victim' recovery . . . to situations in which the defendant's negligence is 'by its very nature directed at' the plaintiff. However, *Ochoa* also indicated that the dimensions of the . . . tort might be expanded further for 'bystander' plaintiffs . . . . The court observed that the factors set forth in *Dillon* had been offered only as guidelines, and suggested that none was essential to recovery . . . . Forseeability that the injury would cause emotional distress was the proper inquiry. [Citation.]

"That dictum in *Ochoa* was broader than the issue presented . . . . The allegations of the complaint satisfied only two of the *Dillon* factors—[the mother] was at the scene of the negligent injury producing conduct and was closely related to the person whose physical injury caused her distress. Defendants' negligence in failing to give proper medical treatment, however, was not a sudden accidental occurrence and thus the second *Dillon* factor was not met . . . . [Citation.] . . . [A]s to 'bystander' . . . actions, *Ochoa* held only that recovery would be permitted if the plaintiff observes both the defendant's conduct and the resultant injury, and is aware at that time that the conduct is causing the injury." (*Thing* v. *La Chusa, supra*, 48 Cal.3d at pp. 660-661, fn. omitted.)

After discussing scholarly criticism of the theories under which recovery has been permitted for the negligent infliction of emotional distress, *Thing* v. *La Chusa, supra*, 48 Cal.3d 644 expresses the view that "foreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of the [negligent infliction of emotional distress] action. The *Dillon* experience confirms . . . that '[f]oreseeability proves too much . . . . Although it may set tolerable limits for most types of physical harm, it provides virtually no limit on liability for nonphysical harm.' [Citation.] . . . In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited." (At pp. 663-664.)

After noting several limiting factors and policy concerns addressed in other cases, the court identifies "[t]he elements which justify and simultaneously limit an award of damages for emotional distress caused by awareness of the negligent infliction of injury to a close relative [as] . . . the traumatic emotional effect on the plaintiff who contemporaneously observes both the event or conduct that causes serious injury to a close relative and the injury itself." (*Thing* v. *La Chusa, supra*, 48 Cal.3d at p. 667.) Thus, the court holds, "a plaintiff may recover damages for emotional

distress caused by *observing* the negligently inflicted injury of a third person" only in strictly limited circumstances. To recover, the plaintiff must "(1) [be] closely related to the injury victim; (2) . . . [be] present at the scene of the injury-producing event at the time it occurs and . . . then [be] aware that it is causing injury to the victim; and (3) as a result suffer[] serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (*Id.* at pp. 667-668, italics added, fns. omitted.)

In its limitation of the circumstances in which a "bystander" may recover damages for negligence resulting in emotional distress to one who is not physically injured by the defendant's conduct, *Thing* v. *La Chusa, supra*, 48 Cal.3d 644 does not expressly overrule any prior Supreme Court case and does not appear to do so implicitly. While the opinion criticizes *Krouse* v. *Graham, supra*, 19 Cal.3d 59 (*Thing, supra*, 48 Cal.3d at p. 656), the plaintiff in *Krouse* would meet the requirements set forth in *Thing*. Similarly, the opinion rejects a particular dictum in *Ochoa* v. *Superior Court, supra*, 39 Cal.3d 159 (*Thing, supra*, 48 Cal.3d at pp. 660, 668), but again, the plaintiff in *Ochoa* would meet the requirements now enunciated. Consequently, in *Thing*, the court attempts a clarification of the entire body of law on this subject expressed in prior Supreme Court decisions, not its elimination; thus, the opinion applies to the instant matter. (See *Golstein* v. *Superior Court* (1990) 223 Cal.App.3d 1415, 1427 [273 Cal.Rptr. 270].)

■ Under the standards set forth in *Thing* v. *La Chusa, supra*, 48 Cal.3d at pages 667-668, plaintiff cannot recover damages for the negligent infliction of emotional distress on a "bystander" theory. As Marlon's father, plaintiff clearly is closely related to the asserted "victim" and he does allege he suffered severe emotional distress. However, he meets none of the other requirements. Plaintiff did not observe defendants' alleged injury-producing conduct, i.e., their encouragement of and failure to take any steps to stop Marlon's mother from implementing her plan to remove Marlon from the country and conceal his whereabouts from plaintiff. He most assuredly was not present when defendants acted or failed to act, and he was not then aware the defendants' conduct was causing "injury" to Marlon. It remains to be seen whether plaintiff may maintain an action successfully on a "direct victim" theory.

It is clear from the general tenor of the discussion in *Thing* v. *La Chusa, supra*, 48 Cal.3d 644 that the Supreme Court intends to dismantle entirely the "direct victim" distinction drawn in *Molien* v. *Kaiser Foundation Hospitals, supra*, 27 Cal.3d 916 and further expounded in *Ochoa* v. *Superior Court, supra*, 39 Cal.3d 159. The majority opinion expresses open scorn for the distinction, characterizing it—incorrectly in the view of some (see

*Thing, supra,* 48 Cal.3d at pp. 678-680, dis. opn. of Mosk, J.; *Ochoa* v. *Superior Court, supra,* 39 Cal.3d at p. 172)—as based solely on the foreseeability of the injury. However, *Thing* v. *La Chusa, supra,* involves the prototypical automobile accident in which the child of the plaintiff is injured by the negligent acts of the driver. The mother was nearby, but not in the immediate vicinity, and neither saw nor heard the accident. (48 Cal.3d at p. 647.) In those factual circumstances, there could be no question of the defendant's conduct being, by its very nature, directed at the mother plaintiff; obviously, it was not.

Thus, whatever clear signal the court may have sent in *Thing* v. *La Chusa, supra,* concerning the viability of a "direct victim" theory of recovery, this dictum is not controlling precedent (*Hollister Convalescent Hosp., Inc.* v. *Rico* (1975) 15 Cal.3d 660, 668, 672 [125 Cal.Rptr. 757, 542 P.2d 1349]), although it should be regarded as highly persuasive (*Santa Monica Hospital Medical Center* v. *Superior Court* (1988) 203 Cal.App.3d 1026, 1033 [250 Cal.Rptr. 384]). Affording this dictum the respect it is due is complicated in this matter by the Supreme Court's nearly simultaneous opinion in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d 583. At no point in *Thing* does the Supreme Court even mention *Marlene F.,* let alone criticize its reasoning or reliance on a "direct victim" theory of recovery. As matters stand now, we deem it wise to assume a "direct victim" theory, as illuminated and limited by *Marlene F.* and *Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, remains viable.

As noted, *ante,* negligence in the treatment of another is actionable for the resulting serious emotional injury to the closely related plaintiff only when the negligent conduct is "by its very nature directed at" the plaintiff. (*Ochoa* v. *Superior Court, supra,* 39 Cal.3d at p. 172.) Needless to say, plaintiff characterizes defendants' conduct as meeting this requirement. He places his primary reliance on *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d 583. In *Marlene F.,* three mothers brought their sons to the clinic to obtain counselling for family emotional problems. All of the sons were assigned to the same therapist, who began treating the mother as well in each case; he believed the children's emotional difficulties arose partially from problems in the mother-son relationships. Later, the mothers learned the therapist had molested each of their sons sexually during counselling sessions; this caused the mothers great emotional distress. (*Id.* at pp. 585-586.)

The specific circumstances of the case were of prime importance to the court: "In the present case, the complaint explicitly and expressly alleged that the mothers . . . , as well as the children, were patients of the therapist; specifically, that he 'undertook to treat both [mother and son] for their

intra-family difficulties by providing psychotherapy to both . . . .' It further alleged that the therapist 'was aware of the relationship between the patients' and that he 'believed that one of the problems in the family arose from the relationship between [mother and son].' In other words, the counselling was not directed simply at each mother and son *as individuals,* but to *both in the context of the family relationship.* And the complaint alleged that the discovery by the mothers of the therapist's sexual misconduct caused them serious emotional distress, further disrupting that family relationship.

"In these circumstances, the therapist, as a professional psychologist, clearly knew or should have known in each case that his sexual molestation of the child would *directly injure* . . . his other patient, the mother, as well as . . . the *parent-child relationship* that was *also under his care.* His abuse of the therapeutic relationship and molestation of the boys [thus] breached his duty of care to the mothers as well as to the children. [Citations.]" (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at pp. 590-591, italics added.)

In other words, the therapist's tortious conduct was, by its very nature, "directed at" the mother plaintiffs because he treated the mothers directly and the very purpose of the therapy for both mothers and sons was to resolve intrafamily difficulties by improving the mother-son relationships. The clear implication is that the court would *not* have viewed the mothers as "direct victims" had the therapist treated the sons only for the purpose of resolving the *sons'* individual emotional problems, even if these problems led to family difficulties, rather than treating the parent-child family problems themselves. This conclusion is bolstered by the court's subsequent language in stating: "It bears repeating that the mothers here were the patients of the therapist along with their sons, and the therapist's tortious conduct was *accordingly* directed against both. They sought treatment for their children . . . and agreed to be treated themselves *to further the purposes* of the therapy." (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at p. 591, italics added, fn. omitted.)

There is a clear contrast between the allegations considered dispositive in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d 583 and those of plaintiff's second amended complaint. Plaintiff expressly alleges "[a]s psychotherapists and mental health care providers *for* [*plaintiff's*] *minor* [*son*], . . . the defendants owed legal duties to . . . provide proper family therapy for the benefit of *Marlon* . . . [,] the duty . . . to exercise due care in the performance of therapy and counseling to *Marlon.*" (Italics added.) Consistent with this allegation, plaintiff further alleges "*Marlon* began therapy in August 1982. He was seen for weekly sessions, and follow up appointments were made between *Marlon's* therapist and his

mother and father . . . . At times during the course of *Marlon's treatment* [, plaintiff] participated in such meetings with *Marlon's therapist* upon the recommendation of the defendants." (Italics added.) In addition, plaintiff alleges "[t]he agreed treatment included counselling [plaintiff] and [Marlon's mother] for the purpose of *assisting* the psychiatrist in therapeutic work with *Marlon*." (Italics added.) In other words, Marlon's therapist periodically attempted to enlist the aid of his parents in furthering Marlon's therapeutic progress. Obviously, these allegations leave no basis for determining that plaintiff was himself a patient of defendants being treated jointly with Marlon to resolve emotional problems having their root in the father-son relationship.

Plaintiff attempts to overcome the latter deficiency by alleging he participated in meetings with Marlon's therapist "as a part of the overall effort to treat the *family* emotional problems and to improve the relationships between Marlon and his parents." (Italics added.) In addition, he alleges he "entered into an oral agreement with defendant [clinic on approximately August 3, 1982] whereby [defendant] agreed to treat . . . the emotional and psychological conditions existing between Marlon . . . *and his parents*. . . . One of the express purposes for which [plaintiff] agreed *Marlon* was to receive counselling was to improve his relationship [*with*] *his parents*." (Italics added.) Plaintiff characterizes Marlon as a "third party beneficiary" of this contract, and alleges he "agreed to attend counselling sessions when he was requested to do so, and he also agreed to participate in individual psychotherapy. [Plaintiff] agreed to pay for, and defendants agreed to provide such services."

Even taken at face value, the allegations quoted above, when considered with all other pertinent allegations, show the intent and purpose of the therapy was to treat Marlon and Marlon alone for particular emotional problems. That one goal of Marlon's psychotherapeutic treatment was to address the emotional problems existing between Marlon and his parents and to improve Marlon's relationships with his parents does not necessarily establish that the treatment was directed at or intended to affect plaintiff's singular interests. Nothing in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d 583 suggests this in itself would be enough. Rather, the facts alleged must show the "breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." (*Id.* at p. 590.) In *Marlene F.,* the court considers it dispositive that the "end and aim" of the contract was the treatment of intrafamily dysfunction, a goal necessarily requiring the treatment of all the participants in the dysfunction. (*Id.* at p. 591.)

Nothing in the instant complaint suggests defendants were treating Marlon with the "end and aim" of ameliorating family dysfunction in general. The treatment was directed at improving Marlon's mental health and resolving his particular problems, thus improving his relationship with his parents, *not* at treating the general dysfunction in the family unit. That pursuit of this goal secondarily might affect plaintiff's interest in a father-son relationship either beneficially or adversely would not alter the basic end to be achieved. Even in the absence of negligence, the treatment of the emotional problems of one family member well may have an adverse effect on the relationship of the patient with one or more other members of the family. Distancing the patient from some or all other family members may be the only available route to mental health. That a third party thus suffers an adverse consequence does not mean the defendant's conduct is directed at the third party.

Neither do plaintiff's allegations that he agreed to and did consult with Marlon's treating therapist periodically to assist in Marlon's treatment and agreed to undergo psychotherapy himself serve to create a "joint treatment" relationship like that found to exist in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra*, 48 Cal.3d 583. First, plaintiff expressly alleges the purpose of his meeting or "counselling" with the therapist was to assist in *Marlon's* treatment; and second, plaintiff does *not* allege he agreed to undergo psychotherapy jointly with Marlon or to receive it from the same therapist. More importantly, he does not allege he *received* such psychotherapy, let alone that he received it from the same therapist or even from defendant clinic. In sum, plaintiff simply has not alleged the existence of those circumstances found controlling in *Marlene F.*, i.e., a psychotherapist-patient relationship with the parent as well as the child and a primary purpose of treating the intrafamily or parent-child relationship itself, rather than individual emotional difficulties. (*Id.* at pp. 590-591.)

Plaintiff also places considerable reliance on several appellate cases that predate *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra*, 48 Cal.3d 583. In *Andalon* v. *Superior Court* (1984) 162 Cal.App.3d 600 [208 Cal.Rptr. 899], the defendant physician negligently failed to detect during pregnancy that his patient was carrying a fetus afflicted with Down's Syndrome. As a consequence, the parents unwittingly continued the pregnancy to term, although the birth of such a child was unwanted. (At pp. 615-616.) The court saw both parents as direct victims of this negligence: "[The mother] was a party to the contract with the defendant and no issue of his duty to advise her concerning mongolism is tendered at this stage of the action. [The father's] interest in the receipt of information and advice on this topic mirrors hers. His injury is not merely derivative of [his wife's] injury but flows from his role as a participant in the reproductive life of the

marital couple and its lawful choices . . . . The tort duty arising from the contract, between defendant and [the mother], runs to him, not merely because of the foreseeability of emotional harm to him, but because of the nexus between his significant interests and the 'end and aim' of the contractual relationship." (*Id.* at p. 611, fn. omitted.)

In reaching this conclusion, the *Andalon* court characterized the "direct victim" theory of *Molien* v. *Kaiser Foundation Hospitals, supra*, 27 Cal.3d 916 as an outgrowth of *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]. (*Andalon* v. *Superior Court, supra*, 162 Cal.App.3d at pp. 609-610.) In *Biakanja*, the plaintiff was the intended third party beneficiary of a contract his brother had made with the defendant to draft a will. The contract was performed negligently, resulting in the plaintiff receiving only an intestate share of the estate instead of its entirety. (*Biakanja, supra*, at p. 648.) After considering "whether defendant was under a duty to exercise due care to protect plaintiff from injury and was liable for damage caused plaintiff by his negligence even though they were not in privity of contract" (*ibid.*), the court concluded on policy grounds that the duty did exist. In reaching this conclusion, the court balanced several factors, including "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Id.* at p. 650.)

Having noted the policy considerations the Supreme Court balanced in *Biakanja* v. *Irving, supra*, 49 Cal.2d 647, the *Andalon* court makes the following observation: "The 'direct victim' requirement of *Molien* [v. *Kaiser Foundation Hospitals, supra*, 27 Cal.3d 916] can be analyzed along *Biakanja* lines. Mr. Molien was a direct victim of Kaiser's negligent omissions or actions which they had a duty to avoid as a result of the physician-patient relationship. With respect to the misdiagnosis of communicable sexual disease it must be said, as it was in *Biakanja*, that an 'end and aim' of the transaction with Mrs. Molien *directly* implicated the interests of Mr. Molien. The injury was not merely derivative of an injury to his spouse, i.e., indirect. Both Mr. and Mrs. Molien's interests in harmonious relations with their spouses were impinged by the inherent influence of Kaiser's misbehavior. Mr. Molien's interest in avoiding anxiety that *he* had contracted the disease was simultaneously impinged." (*Andalon* v. *Superior Court, supra*, 162 Cal.App.3d at p. 610, italics in the original.)

Having gone this far, however, the *Andalon* court does no balancing of the various factors noted in *Biakanja* v. *Irving, supra*, 49 Cal.2d at page 650, but simply states as fact that there is a "nexus between [the husband's]

significant interests and the 'end and aim' of the contractual relationship." (*Andalon* v. *Superior Court, supra,* 162 Cal.App.3d at p. 611.) However, an application of the *Biakanja* factors to the facts of *Andalon* does yield the same result.

Clearly, when a married woman contracts for prenatal care, one of the most important aspects of a couple's joint reproductive life, the "end and aim" of the contract is at least in part the delivery of those services and that information essential to an informed decision on whether to continue the pregnancy to its conclusion. It is equally clear the husband has an interest in the proper delivery of this care as great as that of the wife; the treating physician's actions are, by their very nature, directed at the husband's interests to the same extent as they are to those of the wife. Stated otherwise, the transaction is intended to affect the husband—one-half of a reproductive entity—to a considerable extent, the risk of harm to him is readily foreseeable, there is a high degree of certainty he suffered injury from the defendant's negligence and that injury is closely connected to the defendant's conduct. (*Biakanja* v. *Irving, supra,* 49 Cal.2d at p. 650.)

In contrast, when parents arrange for the psychotherapeutic or other medical treatment of their child, the "end and aim" of the contract is to enhance the child's health by ameliorating the condition requiring treatment. While parents assuredly have a great interest in seeing their child's health enhanced, their interest is not united with that of the child. The parents' interest in the child's health is actually an interest in their own well-being, their peace of mind. Thus, it is a secondary, incidental interest that the caregiver's conduct is not intended to affect to any significant extent. Any injury to the parents as a result of the caregiver's conduct will be derivative of the injury to the child. In sum, the present case lacks the close unity of interest the court found in *Andalon*. As we note *post,* the absence of such closely unified interests tips the balance in favor of nonliability.

The facts of *Accounts Adjustment Bureau* v. *Cooperman* (1984) 158 Cal.App.3d 844 [204 Cal.Rptr. 881], on which plaintiff also relies, lend themselves as well to a *Biakanja* analysis. In *Accounts Adjustment Bureau,* the court held "[a] negligent diagnosis of a child can, as a matter of law, cause serious emotional distress to a parent. It would be pure fiction to believe that a negligent diagnosis of a two-year-old could not foreseeably cause parents serious emotional distress . . . . Parents having sole responsibility for their child can be direct victims of their child's misdiagnosis." (158 Cal.App.3d at pp. 848-849.) This is a pure foreseeability analysis and, as such, it is inadequate. (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at pp. 589-590.) However, in *Kossel* v. *Superior Court*

(1986) 186 Cal.App.3d 1060 [231 Cal.Rptr. 183], the same court later clarified this holding by noting "communication of the negligent diagnosis was made directly to the [Coopermans] by receipt of the bill. Indeed diagnosis of an infant's health typically is given to the parents not the child and in large part for their direct benefit. Thus, they are 'direct victims' of any misdiagnosis . . . ." (At p. 1067.)

In terms of the *Biakanja* factors, a transaction in which the defendant is to diagnose the condition of a child clearly is intended, to a great extent, to affect the child's parents. It is the parents who bear the responsibility of deciding on appropriate treatment and planning for the child's future. The risk of injury to the parents from negligent misdiagnosis is readily foreseeable; not only may it cause them great and unwarranted anxiety but, depending on its form, it may cause them to forego treatment or making other provisions for the child's future that they otherwise would consider essential. For the same reasons, there will be a high degree of certainty that the parents have suffered injury. Finally, it is equally certain that the defendant's conduct in negligently misdiagnosing the child's condition will be closely connected to the injury the parents will suffer; their injury is a direct one, not derivative of the injury the child suffers. (See *Biakanja* v. *Irving*, *supra*, 49 Cal.2d at p. 650.)

As noted *ante*, in contrast to diagnosis, treatment of an ill child is undertaken for the direct benefit of the child, *not* the parents. (See *Ochoa* v. *Superior Court*, *supra*, 39 Cal.3d at pp. 172-173.) Any benefit the parents receive is indirect and incidental, in the form of the peace of mind that comes with knowing one's child is receiving needed medical care. That is, a transaction in which the defendant is to provide a child with medical treatment is intended to affect the child's parents only to a slight extent. To be sure, it is readily foreseeable that the delivery of negligent medical treatment may cause the parents emotional distress, but there is not a particularly close connection between the defendant's negligent medical treatment of the child and any injury the parents may suffer. Their injury will be largely derivative of any injury the child suffers; it is one they would suffer even in the face of nonnegligent but unsuccessful medical treatment. (See *Biakanja* v. *Irving*, *supra*, 49 Cal.2d at p. 650.)

The same court that decided *Andalon* v. *Superior Court*, *supra*, 162 Cal.App.3d 600 subsequently decided *Newton* v. *Kaiser Foundation Hospitals* (1986) 184 Cal.App.3d 386 [228 Cal.Rptr. 890], and it is on the latter case that plaintiff pins most of his hopes. In *Newton*, a child was born with permanent paralysis of the upper arm, allegedly as a result of negligence during childbirth. Noting *Andalon*'s use of the analysis employed in *Biakanja* v. *Irving*, *supra*, 49 Cal.2d 647, the *Newton* court articulated the

decisive factor as a "doctor-patient relationship with [one party which] directly implicate[s] the interest of the [other] . . . ." (184 Cal.App.3d at p. 391.) The court then noted the undeniable verity that the mother was a direct victim of the alleged negligence, in that overseeing the delivery of the child from the mother's womb was intended to affect the mother. (*Id.* at p. 392.) Following this observation, the court concluded the relationship between the defendant and the mother also "implicated the reproductive efforts of the couple, which personally interests [the father]"; thus, the negligence during the birth process was directed at the interests of both parents. (*Ibid.*)

The court's statement in *Newton* v. *Kaiser Foundation Hospitals, supra*, 184 Cal.App.3d at page 392, that the contractual relationship of the mother with the defendant "implicated the reproductive efforts of the couple" defies logic. There is a clear distinction between the interests implicated in prenatal care and those implicated in birth-process care.

Prenatal treatment, delivered during pregnancy, primarily is treatment of the pregnant woman toward the end of achieving a desired result. The aim of the physician-patient relationship in that context is not necessarily the birth of a child. Many factors come into play; the parents certainly hope the ultimate result will be the birth of a healthy child, but they may not be willing to risk various other outcomes in pursuit of that goal. At this stage, it is truly the reproductive interests of the woman—or the couple, as the case may be—that are at stake. The primary interest is in being able to decide whether all the circumstances occurring during the pregnancy, all the aspects of the prenatal care they seek, favor pursuing the pregnancy to its conclusion. The birth process implicates different interests, for a new "patient" enters the picture—the infant. Medical care delivered during the birth process treats the infant as well as the mother. Each is owed a duty of care. However, the "reproductive interests" of the couple are no longer at issue; the time for making reproductive decisions has passed, a consideration *Newton* v. *Kaiser Foundation Hospitals, supra*, 184 Cal.App.3d 386, fails to recognize.

To say the father's interests are implicated at this point and the caregiver's conduct is "directed" at him is a nearly limitless extension of liability. If this is the case during the birth process, then why not at any point during the child's minority? The father's interest in the birth of a healthy infant is no different from his interest in the continued well-being of his living child. And if this is the case with parents and their children, why not between spouses? A husband has no less compelling an interest in the continued well-being of his wife through the delivery of competent medical care than does the father in the delivery of care to his living child. Yet the courts have

drawn the line at entertaining such claims when they are made by one spouse based on injury to the other, concluding the negligent conduct is directed solely at the spouse who is actually the patient. (See, e.g., *Kossel* v. *Superior Court, supra,* 186 Cal.App.3d at p. 1067; *Budavari* v. *Barry* (1986) 176 Cal.App.3d 849, 853-854 [222 Cal.Rptr. 446].)

Reduced to its essentials, *Newton* v. *Kaiser Foundation Hospitals, supra,* 184 Cal.App.3d 386 stands for the proposition that liability will be imposed whenever a party has a contractual relationship with the defendant that imposes a duty of care and an intimate relationship with the plaintiff that makes the plaintiff's emotional distress foreseeable. Recognizing the true import of *Newton,* Division Seven of the Second District reached a diametrically opposed conclusion on nearly identical facts in *Martinez* v. *County of Los Angeles* (1986) 186 Cal.App.3d 884 [231 Cal.Rptr. 96]. The *Martinez* court characterizes *Newton* as "an unwarranted extension of *Andalon* [which] results in a boundless liability for emotional distress of parents who 'contract' for delivery of, or care for, a child who becomes a victim of medical malpractice." (*Id.* at p. 892.) As discussed, *ante,* that is an appropriate characterization of *Newton;* a doctor-patient relationship with a child will always implicate some interests of the parents, but it does not follow logically that the implication of those interests necessarily justifies imposing a duty of care owed to the parents.

We consider *Martinez* v. *County of Los Angeles, supra,* 186 Cal.App.3d 884 the more soundly reasoned of these two cases, and decline to follow *Newton* v. *Kaiser Foundation Hospitals, supra,* 184 Cal.App.3d 386. Thus, we hold that when the negligence is alleged to have occurred during the medical treatment of the child, the defendant's conduct is directed solely at the child, the intended third party beneficiary of the contract (see *Arata* v. *Bank of America* (1963) 223 Cal.App.2d 199, 206-207 [35 Cal.Rptr. 703]), and not at the parent who enters into the contract solely as a surrogate for the minor child who otherwise could disaffirm it (see *Doyle* v. *Giuliucci* (1965) 62 Cal.2d 606, 610 [43 Cal.Rptr. 697, 401 P.2d 1]). (*Martinez, supra,* at p. 893.) In sum, the simple existence of a contract between a parent and a medical caregiver to provide medical treatment for a child is not in itself sufficient to impose on the caregiver a duty of care owed to the parent.[1] Since plaintiff alleges nothing but negligence in the psychotherapeutic treatment of his son, he has failed to state a claim based on the negligent infliction of emotional distress.

---

[1] To date, the Supreme Court has declined to reach the question of whether the existence of a duty of care, owed to the parents, may be premised "solely on the basis of a contract they enter into for the care of their child," thus permitting "recovery for [parental] emotional distress if that care is not properly rendered. [Citations.]" (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at pp. 591-592, fn. 7.)

### II-IV*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

The judgment is affirmed.

Ortega, J., and Vogel, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 14, 1991. Mosk, J., was of the opinion that the petition should be granted.

---

* See footnote, *ante*, page 149.