[No. G012429. Fourth Dist., Div. Three. Oct. 5, 1993.]

CAIN SMITH, Plaintiff and Appellant, v.
KEITH PUST et al., Defendants and Respondents.

## COUNSEL

Lopez & Hodes and Michael E. Raabe for Plaintiff and Appellant.

Sedgwick, Detert, Moran & Arnold, David Humiston and Frederick D. Baker for Defendants and Respondents.

## OPINION

**SILLS, P. J.**—MaryBeth Smith had a brief sexual encounter with her therapist which destroyed her marriage to Cain Smith. The offended husband sued the therapist and the therapist's employer. California abolished the torts of alienation of affection and criminal conversation (a euphemism for a third party's sexual intercourse with an adulterous spouse)[1] more than 50 years ago, so the complaint was framed as a medical malpractice action. However, after the husband's deposition established that Cain Smith was *not* the therapist's patient, the court granted summary judgment for the defendants.

We affirm. The substance of the lawsuit is one for criminal conversation and alienation of affection, and the facts of this case cannot be shoehorned into causes of action for medical malpractice, negligence or intentional infliction of emotional distress.

I

Cain Smith's deposition revealed that a church pastor referred his wife MaryBeth to defendant Earl Henslin of Harbor Family Practice for counseling concerning "repressed memories" arising out of childhood sexual abuse. Cain stated this counseling was "for herself."[2]

Dr. Henslin, however, was "very busy," and he referred her to his associate, defendant Keith Pust. MaryBeth told her husband that she "would feel comfortable with Keith Pust." She filled out a patient questionnaire and met Pust for the first time in October 1989. She saw Pust weekly from October 1989 to May 1990.

Pust asked MaryBeth to have Cain sit in on a counseling session. Cain decided to do so because he was "very interested in her therapy" and wanted to help his wife. At this session the couple talked about the child-care needs

---

[1]For definitions of "criminal conversation" see *Jacks* v. *Jacks* (1956) 140 Cal.App.2d 852, 853, footnote 2 [295 P.2d 921], and *Hirschy* v. *Coodley* (1953) 116 Cal.App.2d 102, 103 [253 P.2d 93].

[2]From the deposition transcript:

"Q And did you go with your wife when she sought counseling from Dr. Henslin?

"A When my wife sought counseling with Dr. Henslin, my wife was doing it for herself, and she needed to do it for herself. [¶] So she decided that it would be good for her to go by herself."

of their daughter, and whether MaryBeth Smith might need "some help in the child-care department."

Cain "was asked" to attend one other session. He "just sat there" and tried to be supportive of MaryBeth while Pust asked her questions. He left during the last 15 minutes of the session.

In addition to these two sessions Cain spoke with Pust a number of times on the telephone, "[j]ust to help him [Pust] in the therapy of [MaryBeth]."

In May 1990 MaryBeth told Cain she "had had sexual contact with Keith Pust" two weeks before and "wouldn't blame [Cain] if [he] never talked to her again . . . ." Cain then went to Pust's office and "point blank asked" him, "Did you have sexual contact with my wife." Pust answered yes.

Cain said he wanted "to know exactly what happened." Pust answered, "Like what?" Cain pressed him, "Like exactly what happened in the car?"

Pust told Cain that he and MaryBeth drove to a parking lot. "I made an advance, Cain, and kissed her."

Pust continued (as recounted in Cain's words at his deposition): "And then they took each other's clothes off, and she had oral sex with him. And he didn't say that he wanted more than that, but my wife had. [¶] And he said that then they had—they made love together. [¶] And he said he was sorry about that. And he said it was a mistake, and he didn't mean it to happen. [¶] And then he proceeded to tell me that there was nothing kinky that happened, without me asking."

Then Pust said something Cain would "never forget forever." "Cain, if Earl Henslin had told me 2 weeks ago that I was going to end up in the sack with MaryBeth Smith, I'd have never believed him."

Pust's comments bothered Cain. He thought, "[t]hat would have been fine if I didn't know the girl, if I really didn't care about the girl and we were talking street talk." He felt "numb" and "completely shocked." He told Pust, "I thought he had been doing a great job." Cain would later explain at his deposition, "I did mention that, and I was wrong."

At his deposition Cain could remember nothing more of his conversation with Pust. He did, however, describe the general tenor of the conversation: "We weren't in a situation where we were at gunpoint with each other at all. We were both just very upset with him and what had happened. . . . [¶] We

did a lot of—just not talking. Just looking at the floor and crying and just—I can't explain to you what we talked about."[3]

Cain also stated in his deposition that he could not recall ever filling out a patient questionnaire for Keith Pust. When asked if he "ever" had sought any counseling himself, he only mentioned counseling after May 1990. He did state that he "considered [himself], when in counsel with Keith Pust, a patient." It is undisputed, though, that Cain never had any written contract with Pust.

■■■ In May 1991 Cain filed a complaint against Pust, Henslin and Harbor Family Practice, asserting causes of action for negligence, bad faith, intentional infliction of emotional distress and negligent infliction of emotional distress.[4] Defendants' summary judgment followed in the wake of the deposition testimony.

## II

There are two ways to look at the negligence part of this case. Both lead to the same conclusion.

## A

■ The substance of Cain Smith's suit is plainly alienation of affection and criminal conversation: Defendant Keith Pust had sexual intercourse with Cain's wife, which fact played at least some part in the subsequent breakup of his marriage. It is that simple. (Cf. *Bedan* v. *Turney* (1893) 99 Cal. 649, 653 [34 P. 442] [right of action for criminal conversation "established upon proof of the intercourse" regardless of whether wife consented].)

---

[3]Cain submitted a declaration in opposition to the summary judgment motion which put a completely different spin on events. Here is the text of the declaration:

"I confronted Mr. Pust that day in his office. Mr. Pust bragged to me that he had made sexual advances toward my wife in the front seat of my car; that he had induced my wife to perform oral sex on him; that they had had intercourse in my car; and that Pust had achieved orgasm in the process. He indicated to me that while the original sexual episode with my wife had been 'accidental', future such incidents would not be an 'accident.' The tone and demeanor of Mr. Pust at this time made it very clear that he knew that such bragging would cause me severe emotional distress, and that it was intended for that purpose."

We address the discrepancy between the two stories in part III, which addresses Cain's claim for intentional infliction of emotional distress.

[4]As to the last cause of action, there is no such "independent" tort. (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278].)

Looking at the nub of plaintiff's gist, it is clear that he is suing on long-dead causes of action.[5] (*Atienza* v. *Taub* (1987) 194 Cal.App.3d 388, 393-395 [239 Cal.Rptr. 454] [cause of action against physician for medical malpractice based on "an unhappy affair" with him was in reality an action for seduction, which had been abolished]; *Gasper* v. *Lighthouse, Inc.* (1987) 73 Md.App. 367 [533 A.2d 1358, 1361] ["real basis" of action by husband for medical malpractice against marriage counselor after wife's affair with counselor was alienation of affection and criminal conversation and therefore precluded by virtue of the abolition of such actions]; *Lund* v. *Caple* (1984) 100 Wn.2d 739 [675 P.2d 226, 228] [lawsuit by husband against church pastor after pastor's affair with wife was "essentially a substitute for an alienation of affections suit"]; *Nicholson* v. *Han* (1968) 12 Mich.App. 35 [162 N.W.2d 313, 316-317, 33 A.L.R.3d 1386] ["substance" of husband's action for breach of contract and medical malpractice against psychiatrist-marriage counselor after discovery of counselor's intimacy with wife was alienation of affection and criminal conversation].)

Indeed, two of these out-of-state cases apply to this case a fortiori. In *Gasper* and *Nicholson* there had been a counselor-counselee relationship between the defendant doctors and the plaintiff husbands, something (as we explain in more detail below) that cannot be said here.

█ There is authority in California, however, that conduct which constitutes alienation of affection or criminal conversation is not immune from tort liability if it "breaches a duty of care *independent*" of those old causes of action. (*Richard H.* v. *Larry D.* (1988) 198 Cal.App.3d 591, 595 [243 Cal.Rptr. 807], italics added.) Our research has uncovered five California cases which delineate the circumstances under which such an "independent"

---

[5]Both alienation of affection and criminal conversation were predicated on the notion that a wife was a chattel of the husband. With regard to alienation of affection, see *Moulin* v. *Monteleone* (1927) 165 La. 169 [115 So. 447, 450]: "At common law, the right of action for damages for alienation of a wife's affections is in some measure based upon the same obsolete idea that the wife is one of the husband's chattels, and that her companionship, her services and her affection are his property, for the loss of which, by wrongful inducement on the part of another man, the husband ought to be compensated with money. 3 Blackstone, p. 143, explains that that is why, at common law, the wife has no such right of action for alienation of the affections of her husband . . . ." (*Moulin* was overruled on another point in *9 to 5 Fashions, Inc.* v. *Spurney* (La. 1989) 538 So.2d 228, 234.)

The California Supreme Court said much the same thing 100 years ago regarding criminal conversation: "The foundation of the husband's right of action is the wrong done him by the defendant in violating his personal rights . . . . Any act of another by which he is deprived of this right constitutes a personal wrong . . . . Her sexual intercourse with another is an invasion of his rights, and it is immaterial whether this invasion is accomplished by force or by the consent of the wife. As the right belongs to the husband, it is no defense to his action for redress that its violation was by the consent or procurement of the wife, *for she is not competent to give such consent*." (*Bedan* v. *Turney, supra,* 99 Cal. at p. 653, italics added.)

duty of care may arise. Those cases are *Richard H., supra,* 198 Cal.App.3d 591, *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d 583, *Schwarz* v. *Regents of University of California* (1990) 226 Cal.App.3d 149 [276 Cal.Rptr. 470], *McDaniel* v. *Gile* (1991) 230 Cal.App.3d 363 [281 Cal.Rptr. 242], and *Atienza* v. *Taub, supra,* 194 Cal.App.3d 388. As we shall see, when read together these cases set up two requirements for such an independent duty of care: (1) a genuine professional relationship must exist between the plaintiff and the defendant, and (2) the wrongful conduct must have a meaningful connection to the *purpose* of that professional relationship.[6]

In *Richard H.,* a psychiatrist had "surreptitious sexual relations" with the wife of a *couple* who "were his patients for the purposes, inter alia, of receiving marital counseling." (198 Cal.App.3d at p. 594.) As this sort of extracurricular hanky-panky could only undermine the marriage, the court concluded the psychiatrist had breached a duty of care to the husband (198 Cal.App.3d at p. 596) who, after all, had retained him to *improve* the marriage.[7]

In *Marlene F.,* the mothers of three boys brought their sons to a psychiatric clinic "to obtain counseling for family emotional problems." (48 Cal.3d at p. 585.) Both the mothers and their sons were patients of the clinic; counseling "was not directed simply at each mother and son as individuals, but to both in the context of the family relationship." (48 Cal.3d at p. 590.) The mothers eventually discovered that a therapist had sexually molested their sons, and sued the therapist and the clinic for their own emotional distress; the defendants successfully demurred. Our Supreme Court reversed and allowed the suit to go forward, reasoning that because the therapy was directed at both the mothers and the sons there was a duty on the part of the therapist that extended to the mothers. (See 48 Cal.3d at pp. 590-592.)

In *Schwarz,* a child began therapy for bedwetting. The treating therapist noted ". . . there was considerable family stress due to the parents' bitter

---

[6]These requirements are, of course, taken for granted in ordinary professional malpractice cases. They come to the fore, however, in offbeat cases like this one.

[7]*Richard H.* would thus appear to be irreconcilable with *Gasper* and *Nicholson.* An out-of-state case similar to *Richard H.* is *Rowe* v. *Bennett* (Me. 1986) 514 A.2d 802 [A.L.R.4th 2405]. In *Rowe* a social worker separately (and on several occasions jointly) counseled the plaintiff and her homosexual partner about their relationship. The social worker started seeing the partner socially while still "treating" the plaintiff, who eventually sued the social worker for serious mental distress caused by the social worker's negligence. The Maine Supreme Court reversed a summary judgment in favor of the social worker, reasoning that the unique vulnerability of a patient to "mental harm" in a psychotherapist-patient relationship justified allowing damages for serious mental distress "despite the absence of an underlying tort." (514 A.2d at p. 806.) The court did not discuss the question of whether the substance of the suit was alienation of affection.

divorce." The child was eventually assigned to another therapist, and the child's mother told that therapist she was moving the child to London "in an effort to free" both of them from the father's "harassment." According to the father's complaint, the therapist "counselled, aided, abetted, encouraged, assisted and facilitated" the move to London and the concealment of the child's whereabouts from the father. (226 Cal.App.3d at pp. 151-152.) When the father found out about it, he sued the therapist for negligence.[8]

The suit was dismissed on the sustaining of a demurrer, and the appellate court affirmed the judgment of dismissal. Because the "intent and purpose" and " 'end and aim' " of the therapy was to ameliorate the child's problems, rather than treating "the general dysfunction in the family unit," the therapist owed no duty to the father not to aid and facilitate the removal of the child to London and his subsequent concealment from the father. (See 226 Cal.App.3d at pp. 162-163.)[9]

*McDaniel* was a case of classic quid pro quo sexual harassment in a professional context. A client retained an attorney to represent her in a marital dissolution action. The attorney made sexual advances toward the client and refused to work on her case unless she gave him sexual favors. When he sued for fees she cross-complained for legal malpractice, but the attorney obtained a summary adjudication declaring the sexual advances gave rise to no such cause of action. (See 230 Cal.App.3d at pp. 370 & 375.) The appellate court reversed, reasoning that the attorney's conduct "necessarily [fell] below the standard of care and skill of members of the legal profession." (230 Cal.App.3d at p. 375.)

*Atienza* arose after the end of an unhappy love affair between a patient and a doctor whom she went to for treatment of phlebitis. The doctor initiated a sexual relationship with the patient, but it was not under the "guise" or "pretext" of treating her. After the affair ended, the patient sued the doctor for medical malpractice. The appellate court affirmed a judgment of dismissal after the sustaining of a demurrer because the doctor's conduct was not "within the scope of the patient—physician relationship." (See 194

[8]Actually, the suit was for negligent infliction of emotional distress, but, as the appellate court noted, it was really a suit for negligence in which damages for emotional distress were sought. (See 226 Cal.App.3d at pp. 153-154.)

[9]This is a bit of a simplification of the rationale in *Schwarz*, though we hope it adequately describes what the court actually did with the facts in front of it. The court in *Schwarz* analyzed the case at length in terms of the case law bearing on when plaintiffs may recover emotional distress damages in a negligence action, and in particular whether the father was a "direct victim" of the therapist's conduct under *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]. (See 226 Cal.App.3d at pp. 153-168.) The point was, the father was not such a victim. This is the second way of analyzing the present case, which we do in part IIB of this opinion.

Cal.App.3d at pp. 392-393.) Just because the sexual relations and the treatment took place over the same period of time did not mean that the doctor was negligent in treating the patient for phlebitis. (See 194 Cal.App.3d at p. 393.)

These five cases form an amazingly consistent whole, in which legal duty depends on both the existence of a professional relationship and a genuine tie-in between the conduct giving rise to the emotional distress and the purpose of that relationship. There is no duty where there was either no professional relationship (*Schwarz*) or an insufficient connection between the allegedly negligent conduct and any professional services for which the defendant may have been engaged (*Schwarz* and *Atienza*).

To elaborate: in *Richard H.*, the therapist undertook to improve the marital relationship of both husband and wife; he had a duty therefore not to make things worse by having sex with the wife. In *Marlene F.*, the therapist undertook to treat the mothers as well as their sons; he had a duty not to cause the mothers the terrible grief that must naturally arise with the realization that one's own child has been sexually molested. By contrast, in *Schwarz*, the father was *not* the therapist's patient, and therefore the therapist had no duty not to conceal the child or facilitate the child's removal to England.

In *McDaniel*, the connection between the defendant's conduct and the professional relationship was about as direct as can be imagined: the attorney refused to work on the case unless his client granted him sexual favors. On the other hand, in *Atienza*, there was a direct professional relationship but no meaningful connection between the conduct (initiating a sexual relationship) and the purpose of the relationship (treating phlebitis).

 Here, Cain strikes out on both requirements. First, despite Cain's presence at two sessions, and his own subjective belief that he was Pust's patient "when in counsel" with Pust, it is clear from his own deposition testimony that he was not Pust's patient. Also, there is no evidence Cain ever filled out a patient questionnaire, and it is undisputed that Cain did not sign a contract with Pust. Cain even left one of the sessions 15 minutes early, underscoring the purpose of the therapy to help his wife and not himself.

Second, the "intent and purpose" of Pust's initial engagement was to help MaryBeth. It was "for her." The need for therapy arose out of MaryBeth's "own" individual problems with "repressed memories" and childhood sexual abuse, as distinct from the couple's relationship qua relationship. Any advice Cain may have received from Pust appears to be strictly incidental to the purpose of dealing with MaryBeth's own problems.

Pust had no more duty to Cain than any other person not to cause Cain emotional distress by having sex with Cain's wife. No "independent duty" exists to rescue the case from its essential nature as a suit for alienation of affection and criminal conversation.

## B

■ The other way to analyze therapist-sex cases is under established rules of negligence which govern when plaintiffs may obtain damages for emotional distress absent any physical injury.[10] Cain invites us to treat his case this way, contending that because it was easily foreseeable that Pust's having sex with MaryBeth would cause Cain emotional distress there was a duty unless policy factors otherwise precluded its existence.

The law governing recovery in negligence for emotional distress damages is a little more complex than simple foreseeability limited by public policy factors. Where there is a claim for the "negligent infliction of emotional distress," the plaintiff must be either a "direct victim" of the wrongful conduct, or, with certain qualifications, a bystander, (i.e., "percipient witness to the injury of another"). (See *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1071-1072 [9 Cal.Rptr.2d 615, 831 P.2d 1197].)[11] Only after ascertaining the applicability of one of these two theories does a court consider whether public policy may nonetheless abrogate the existence of a duty. (See *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868 [2 Cal.Rptr.2d 79, 820 P.2d 181] [after ascertaining plaintiffs were direct victims of defendants, court applied certain policy factors to confirm existence of legal duty].)

We summarily dispense with the bystander theory. It is obviously inapplicable because Cain was not a bystander. He was not a "percipient witness" to any wrongful act.

As far as the "direct victim" theory is concerned, *Burgess* makes clear that the defining principle is a "preexisting relationship" between the plaintiff and the defendant. (2 Cal.4th at p. 1074.) Cain's claim to be a "direct victim" of Pust's conduct thus necessarily requires an actual therapist-patient relationship. As we have discussed above, there was no such relationship.

## III

■ Cain also contends he might be able to recover on an intentional infliction of emotional distress theory.

---

[10]*Rowe* v. *Bennett, supra,* 514 A.2d 802, see footnote 7, *ante*, took this approach, framing its analysis strictly in terms of traditional negligence law.

[11]These qualifications are set out in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 647 [257 Cal.Rptr. 865, 771 P.2d 814]. Chief of these is that the plaintiff must be closely related to the injury victim.

Fortunately, we are spared the nettlesome question of whether the cuckolding of a husband by his wife's therapist is sufficiently "outrageous" as a matter of law that it may form the basis of an intentional infliction of emotional distress suit. Suffice to say this sort of thing has been known to provoke strong, even wild, passions of jealousy and revenge which often lead to violence.

■ However, it is not enough that an act be outrageous to state a cause of action for intentional infliction of emotional distress. Intentional means more than the nonaccidental nature of the wrongful act. That act must also be *directed* at the plaintiff or in the presence of the plaintiff. (*Christensen* v. *Superior Court, supra*, 54 Cal.3d at p. 903 ["It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware."].)

■ No doubt there have been times in human experience when the purpose of sexual relations with one person was "directed at" that person's spouse. This case, however, is not one of them. Both the deposition testimony and the opposition declaration (quoted at fn. 3 *ante*) are plain that the sexual encounter between MaryBeth Smith and Keith Pust was not "directed" at Cain Smith. Even the declaration acknowledges it was an "accident," while the poignant scene painted in the deposition testimony of two sad, crying men silently remorseful about a marital infidelity leaves no doubt.

As to Pust's supposed "bragging" about the encounter (mentioned in the declaration but forgotten at the deposition), any inference of intent to cause emotional distress is directly contradicted by Cain's deposition statement that *he* was the one who asked for a description of what happened. (See *Leasman* v. *Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 382 [121 Cal.Rptr. 768] [statements in affidavits opposing summary judgment motion which are contradicted by admissions at deposition may be disregarded as "irrelevant, inadmissible or evasive"].) Pust did not seek Cain out with the intent of regaling him with a description of the sexual conquest of Cain's wife. It was Cain who came to Pust and pressed him for "exactly what happened in the car."

The other detail set out in the opposition declaration not remembered at the deposition was Pust's statement that the encounter was an "accident" but any future incidents would not be. This simply does not rise to the level of outrageousness necessary to support an intentional infliction of emotional distress cause of action, nor does it show wrongful conduct *directed at* Cain. The statement was a simple truism that any future sexual relations between MaryBeth and Pust would not have the "accidental" or "spontaneous"

quality of their first encounter. The statement hardly shows that the purpose of those relations would be to vex Cain. People usually have sex for other reasons than to annoy third parties.

## IV

The judgment is affirmed. Defendants shall recover their costs on appeal. Nothing we say in this opinion should be construed as affecting any right of MaryBeth Smith to bring an action against Keith Pust. (See Civ. Code, § 43.93.)

Moore, J., and Wallin, J., concurred.

On October 29, 1993, the opinion was modified to read as printed above.