[No. G015080. Fourth Dist., Div. Three. Oct. 14, 1997.]

HARUYO D'ELIA, Plaintiff and Appellant, v.
SERGE D'ELIA, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IIIB.

**COUNSEL**

Gross, Gross & Simon, Marc Dempsey Gross, James M. Simon, Mitchell, Silberberg & Knupp and Hayward J. Kaiser for Plaintiff and Appellant.

Latham & Watkins, Wayne S. Flick, Catherine S. Bridge and Damon C. Watson as Amici Curiae on behalf of Plaintiff and Appellant.

Douglas L. Thorpe, Gale S. Baker, Sanford T. Sherman, Perkins Coie and William P. Hogoboom for Defendant and Appellant.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

Once again this court confronts a family law case which has been allowed to metastasize into something else. In *Askew* v. *Askew* (1994) 22 Cal.App.4th 942 [28 Cal.Rptr.2d 284], a distressed ex-husband sought tort damages in an independent fraud action for false promises of love and affection. In *Smith* v. *Pust* (1993) 19 Cal.App.4th 263 [23 Cal.Rptr.2d 364], a cuckolded husband sought tort damages against his ex-wife's lover. In *In re John W.* (1996) 41 Cal.App.4th 961 [48 Cal.Rptr.2d 899], a fairly well-to-do couple managed to avail themselves of taxpayer-financed counseling and therapy by having their custody dispute litigated in the juvenile dependency courts.

The present case arises out of facts even more directly related to the typical family law case than *Askew*, *Smith*, or *John W.* Here, we have the fairly garden-variety situation of one spouse refraining from conducting an independent appraisal of a family business and consequently making a bad deal in a marital settlement agreement—despite the fact that she was represented by at least two lawyers during the negotiations. This sort of thing happens all the time in family law, and the remedy, if there indeed has been misrepresentation as to the value of the asset, is to set aside the agreement

and any family law judgment which may incorporate the agreement. (E.g., *Vai* v. *Bank of America* (1961) 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247]; *In re Marriage of Varner* (1997) 55 Cal.App.4th 128 [63 Cal.Rptr.2d 894]; see generally, *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1072 [202 Cal.Rptr. 116] [discussing necessity of setting aside marital settlement agreement as well as judgment incorporating it]; see also Fam. Code, §§ 2120 through 2129 [detailing procedures for obtaining relief from family law judgments].)[1] The family law court also retains the power to impose sanctions on a party whose misrepresentations required litigation to undo any agreement or judgment. (See Fam. Code, § 271.)

In the present case, however, the aggrieved spouse did not seek to set aside the agreement. Rather, because the particular community asset involved was stock in a privately held corporation, she filed a lawsuit seeking damages under state securities fraud laws. (See Corp. Code, §§ 25401-25402, 25501-25502.)

There is no precedent for applying securities fraud laws to marital settlement agreements. In fact, the idea is a bad one, because it forces couples undergoing the already traumatic process of dissolution of marriage into the role of securities buyer and seller, complicating and making a process which is already too complicated even more expensive.[2] It creates an incentive to carry over the (all too often) characteristic bitterness of family litigation into the separate arena of securities litigation, where one spouse can try to smack the other with the really big club of tort damages rather than curing a failure to live up to Family Code obligations of disclosure within the more predictable confines of a dissolution proceeding.

Not only is the idea a bad one, but the application of securities fraud law to marital settlement agreements is legally incorrect because it does not

---

[1]And, of course, if a community asset is not before the court in the family law proceeding or is otherwise left unadjudicated or undivided (like a missed pension) it can be the subject of an independent action in equity. (E.g., *Henn* v. *Henn* (1980) 26 Cal.3d 323 [161 Cal.Rptr. 502, 605 P.2d 10]; see generally, Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1997) ¶¶ 8:1501 to 8:1512, pp. 8-354 through 8-358.)

[2]Family lawyers do not get the respect they deserve. In terms of the potential breadth and complexity of issues which they face, family practitioners work in one of the most, and perhaps *the* most, exacting and demanding areas of concentration in the law. Under California's community property laws, every item of marital property presents a host of challenging issues. Not only must the family practitioner worry about the characterization and valuation of each asset, he or she often must consider future tax consequences involved in various items of community property. On top of that, support and custody issues involve different considerations, in which a human *relationship*—as distinct from a discrete event—is the subject of the litigation. Manifestly, we do not need to make family practice even more perilous and expensive for divorcing couples and their lawyers by adding securities law to the already impressive range of legal considerations which must be taken into account in any dissolution.

accord with the fundamental reality of the division of a community estate. It does violence to the *substance* of the division of community property, whether by court judgment or by agreement, to style the allocation to one spouse of any particular community asset as a "sale." California's community property laws aim to assure the equal division of the community estate as a whole, not force husband and wife into the role of stock traders. Accordingly, we now reverse the judgment in this case to the extent that it awards damages on the basis of state securities fraud laws.

We stress that our decision does not rest on some revival of the doctrine of spousal immunity. If, for example, a spouse who was a stockbroker sold her husband 100 shares of ACME-Strike-It-Rich gold mining stock based on the false statement that the company had just found an enormous gold field on its property, the husband could sue the wife, just as any other buyer of stock could sue in the same circumstances. But this case does not involve anything like a true "sale" of stock from one spouse to other *independent* of special duties of disclosure imposed by the substantive family law itself. Here the defendant spouse's duties of disclosure on which the plaintiff predicated her securities fraud case arose out of the *family* law, not the securities law, and it is therefore unfair to allow the plaintiff to assert a *securities* claim based on family-law-imposed duties of disclosure.

## II. FACTS AND CASE HISTORY[3]

Serge d'Elia and Haruyo (Sally)[4] d'Elia were married in 1961 and separated in 1981. During the 1960's, Serge and Sally invested $400,000 in the Van Doren Rubber Company, otherwise known to sneaker aficionados as "Vans." In 1983, Sally petitioned for dissolution. During the course of the dissolution, Sally's attorney recommended an appraisal of the Vans shoe company. Serge told Sally that an appraisal was a waste of time.

In 1984, Vans filed for bankruptcy. Serge requested that Sally put aside the dissolution proceedings so he could devote his energy to the company.

In 1985, Vans emerged from bankruptcy. After that, Serge and Sally had a meeting where Serge told her that he wanted to settle their property rights and was tired of dealing with so many lawyers. Serge told Sally that if she would not hire an attorney or appraiser, he would be fair to her in the settlement. Sally then fired her attorney. That attorney had already engaged

---

[3]As explained below, this case has already been looked at by the Ninth Circuit, and discussed in an unpublished memorandum decision of that court. Our statement of facts owes much to both the Ninth Circuit's opinion and to the trial court's statement of decision.

[4]Haruyo is from Japan. The parties refer to themselves as "Serge" and "Sally" and we follow suit.

the services of a forensic accounting firm for the purpose of doing a full evaluation of Vans's stock. A marital settlement agreement was then negotiated by the parties through the corporate attorney for Vans.

During those negotiations, Serge told Sally that the value of her community interest in Vans was about $525,000. Sally questioned Serge about a newspaper article which indicated a higher value for the company, but Serge assured her the newspaper was wrong and he knew the value of the company better than any reporter. Serge also told Sally that if she chose to keep her share of the community stock she would not be allowed to vote it because none of the wives (of the stockholders) could vote; Vans had never paid any dividends and never would; and there were no plans to sell the company. The most that Serge ever told Sally about the company during the negotiation period was that "sales were up" and if they continued to be up the company would be in good shape. Serge also never provided Sally with any financial statements, weekly or monthly statements, or sales projections.

After the negotiations were completed, the corporate attorney drew up a draft agreement. The corporate attorney advised Sally to retain an attorney to review the language of the agreement, but not the asset values. Sally complied. While she obtained her own lawyers (one of whose signatures would appear under the heading, "Approved as to Form and Content" on the signature page of the agreement), she did not permit them to conduct an independent appraisal of asset values, despite their advice to the contrary.

On July 23, 1986, Serge and Sally signed the marital settlement agreement. The document began by reciting that irreconcilable differences had arisen between Serge and Sally, and the parties had accordingly decided to live permanently separate and apart. It further recited that the dissolution action filed earlier by Sally was still pending, and stated that its purpose was to "settle and forever adjust by and between themselves all present and future property and support rights . . . that either party may have or claim to have, including rights of support, against the other."

The agreement divided the community property of the parties, which included 752.5 shares of the outstanding common stock of Vans. It mentioned several things, including the difficulty of valuing the stock in a closely held corporation, and the fact that the parties had discussed either dividing the stock in kind or having one party purchase the interest of the other. The agreement then recited that "the Husband has heretofore offered and the Wife has heretofore accepted Husband's offer to purchase her interest in said stock for the price and on terms and conditions" as set forth in the agreement. Essentially, those terms and conditions were that Serge

would make three equal payments of $175,000, and that pending full payment, all the stock would be pledged to Sally as security.

At the time, however, Serge knew that the unadjusted book value of the d'Elia's stock in Vans was about $2 million. There is no question that Serge performed his part of the bargain. Sally received her $525,000.

The agreement also provided that to preserve the "privacy and confidentiality" of the parties "with respect to the allocation and division of assets" between them, the agreement would not be submitted to the court for review or filed with the court or attached to the judgment of dissolution. Accordingly, in October 1986, a judgment of dissolution by default was filed in the family law case.[5] The judgment provided that the "community property of the parties has been divided between them in a manner such that each party has received one-half of all community assets to their mutual satisfaction."

A year later, in June 1987, the Vans board decided to try to sell the company. A buyer was found; and, in December 1987, the sale was consummated. Serge received $19 million for his shares in February 1988.[6]

The next month, March 1988, Sally filed suit in federal court, alleging one violation of federal securities laws (section 10(b)5 of the Securities Exchange Act, 15 U.S.C. § 78j(b)) and five causes of action based on state law, including intentional and negligent misrepresentation, state securities fraud, and insider trading. (See Corp. Code, §§ 25401-25402, 25501-25502.) Eleven months later, in February 1989, Sally filed this (state) action, alleging five causes of action corresponding to the five state claims set forth in her federal action. Those claims were: (1) material misrepresentations made in connection with the sale of securities (see Corp. Code, §§ 25401, 25501); (2) intentional misrepresentation; (3) negligent misrepresentation; (4) breach of fiduciary duty; and (5) insider trading (see Corp. Code, § 25402, 25502).

Not much happened in the state action during the balance of 1989, 1990 and most of 1991—the complaint was not served.

Meanwhile, the federal action was litigated: In the summer of 1989, Serge obtained summary judgment from the federal district court on the "10b-5" federal claim and two state claims. Then, declining to exercise pendent jurisdiction over the remaining state claims, the federal district court dismissed the remaining claims.

Sally did not appeal the dismissal of her 10b-5 claim, but did challenge dismissal of her state common law fraud claims. In June 1991 the Ninth

---

[5] We take judicial notice of the judgment in the dissolution case per Sally's request.
[6] He would receive another $3 million in August 1991.

Circuit issued an unpublished memorandum opinion, reversing the dismissal of the state common law claims, reasoning that Sally might be able to prove "constructive fraud" under *In re Marriage of Connolly* (1979) 23 Cal.3d 590 [153 Cal.Rptr. 423, 591 P.2d 911] and *Vai v. Bank of America, supra,* 56 Cal.2d 329 in that Serge had induced her to forego adversary procedures.[7] The Ninth Circuit remanded the matter to the federal district court to decide whether to exercise its pendent jurisdiction over her state common law fraud despite the dismissal of the one federal claim. In passing, the court not only noted that Sally's state claims and federal claim all arose from a "common nucleus of operative fact" but observed that her state securities claims involved a "novel question of state law." That novel question was: "whether the transfer of stock pursuant to the settlement agreement constituted a 'purchase or sale' for purposes of the California Corporations Code." Given the novelty of the problem, the Ninth Circuit observed that the federal district court's decision not to address the matter was well supported by federal-state comity.

The state action was finally served in November 1991, almost three years after it was filed. In January 1992 the parties agreed to have Sally's federal action dismissed without prejudice.

This case came to a bench trial in February 1993. Eight months later the trial court filed its statement of decision. Sally was the big winner. For the first cause of action for material misrepresentations in violation of state securities laws, the judge awarded her $10.2 million. The trial judge reasoned, to quote from her statement of decision, "that the purchase by Serge of Sally's stock interest was a sale and disposition within the meaning of Section 25017 (a) of the Corporations Code. That code section defines a sale as including any disposition of an interest in a security." Other than the reference to Corporations Code section 25017, subdivision (a), the judge mentioned no legal authority or case precedent for her decision.

On the second, third and fourth causes of action for common law intentional and negligent misrepresentation and breach of fiduciary duty, Sally

---

[7] The Ninth Circuit never grappled with the problem of whether the remedy for this fraud involved in each case was some kind of independent action for tort damages or, as was the case in *Vai* and *Connolly,* simply setting aside the deal.

The great tour de force in the area of extrinsic-intrinsic fraud in the family law context is *In re Marriage of Stevenot, supra,* 154 Cal.App.3d 1051. *Stevenot* noted that *Vai* has engendered "substantial confusion over the distinction between extrinsic and intrinsic fraud in family law cases" because it allowed the setting aside of a judgment and marital settlement agreement in a case where there was no *concealment* of the *existence* of community assets or the *existence* of the proceedings. Accordingly, Justice King, writing for the Court of Appeal in *Stevenot,* suggested that *Vai* has been impliedly overruled by the Supreme Court in later decisions (including *In re Marriage of Connolly*) where a concealment of the existence of a community asset was held necessary to show extrinsic fraud. (See *Stevenot, supra,* 154 Cal.App.3d at pp. 1063-1064.) The Ninth Circuit disagreed with the suggestion.

was awarded about $3.9 million. For the fifth cause of action for violation of state laws against insider trading, the judge awarded Sally $5.8 million.

Serge then filed this appeal. He claims the court erred in granting Sally any recovery under the first and fifth causes of action for violation of state securities laws. In his opening brief Serge has not challenged Sally's right to a recovery per se under the second, third and fourth causes of action, though he does attack the sufficiency of the evidence of damages. Accordingly, we do not address Sally's *right* to a recovery under those causes of action, only Serge's contentions regarding the amounts awarded.

Sally has also filed an appeal, contending that she should have received more on her second, third and fourth causes of action, including prejudgment interest. She also claims that the trial court erred in compelling her to release certain judgment liens on Serge's property after he filed an appeal bond.

## III. DISCUSSION

### A. *California's Securities Laws Do Not Apply to Allocations of Community Stock Pursuant to Marital Settlement Agreements*

#### 1. The Division of the Community Estate Does Not Entail the Asset-by-asset "Sale" of Community Property

When stock is community property, each spouse has an equal interest in it, regardless of who is the holder of record. (*Schnabel* v. *Superior Court* (1993) 5 Cal.4th 704, 715 [21 Cal.Rptr.2d 200, 854 P.2d 1117]; see also Fam. Code, § 751 ["The respective interests of the husband and wife in community property during continuance of the marriage relation are present, existing, and equal interests."].) Indeed, each spouse is entitled to the same information and the same right to inspect records. (*Schnabel, supra*, 5 Cal.4th at p. 715 [nonrecordholder spouse had "at least as great a right of discovery from the corporation as any shareholder"].)

Given the equality of interest in any given item of community property, it is easy to leap to the conclusion that an *allocation* of the item to one spouse or the other at the time of dissolution constitutes what is, in effect, a "sale."[8] And most of the time, analyzing an award (or allocation) as a de facto sale is a handy way of thinking about a division of community property. For

---

[8] California's securities fraud statutes are laid out in the Corporate Securities Law of 1968, beginning with section 25000 of the Corporations Code. Like many acts of the Legislature, the law begins with a set of definitions. The definition of a "sale" and "sell" is found in Corporations Code section 25017, subdivision (a), which states: " 'Sale' or 'sell' includes every contract of, contract to sell, or disposition of, a security or interest in a security for

example, it is an old trick of family law judges, when a divorcing couple is bickering about who gets what in the way of miscellaneous property such as pots, pans and furniture, to force the couple to conduct a kind of "auction" whereby each spouse is forced to "bid" for the item. (E.g., *In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 90 [16 Cal.Rptr.2d 575] ["auctions . . . are regularly used by innovative and knowledgeable family law lawyers, often at the suggestion of innovative and knowledgeable family law judges"].) But it would be a mistake to classify the allocation of a given asset *within* the overall division of a community *estate* as a *separate sale* of each item for purposes of the state securities laws.

At the time of dissolution, the family law court *must*, subject to the written agreement of the parties and a few other exceptions, "divide the community estate of the parties equally." (Fam. Code, § 2550.) To ensure that the *estate* is divided equally, the family law court is empowered to "award an asset of the community estate to one party on such conditions as the court deems proper to effect a substantially equal division of the community estate." (Fam. Code, § 2601.) Given that the overall estate, and not any given item, is the focus of the equal division of community property, it is not surprising that spouses who have claimed that they were *entitled* to an in-kind, equal division of a *specific* item of community property have not met with success. (E.g., *In re Marriage of Connolly, supra*, 23 Cal.3d at pp. 602-604 [rejecting party's contention that it was a mistake of law for trial court to award all of certain community stock to husband].)[9]

*In re Marriage of Cream, supra*, 13 Cal.App.4th 81 is instructive on the nature of the division of the community estate under California law. The case arose because the major community asset of the parties was a business —the only privately owned geyser in the United States—that could not be divided equally between the parties. Because both spouses wanted the business after dissolution, the trial court ordered, over one spouse's repeated objections, a private auction to dispose of the geyser in which the parties were to bid for the other's one-half interest. After the husband had the high

value. 'Sale' or 'sell' includes any exchange of securities and any change in the rights, preferences, privileges, or restrictions of or on outstanding securities."

[9]The distinction between publicly traded and close corporations can be important. Publicly traded stock is fungible, so it takes more to show that economic circumstances warrant a disposition *other than* in kind. (See *In re Marriage of Brigden* (1978) 80 Cal.App.3d 380 [145 Cal.Rptr. 716].) The present case, in contrast to *Brigden*, involves stock in a privately held corporation, so this observation from the *Brigden* opinion applies: "Were the stock at issue here stock in a close corporation . . . or shown to be essential to Husband's ability to earn a living then economic circumstances would perhaps warrant the award of the entire block of stock to Husband upon conditions effecting a substantially equal division of property. An asset which is essential to a party's ability to earn a living satisfies a critical need which cannot be satisfactorily replaced." (*Id.* at p. 393, fn. omitted.)

bid at the auction, $600,000, he was unable to close escrow and the wife, in the words of the opinion, "purchased his interest in the property" for her highest bid, which was $596,000. The wife then appealed, challenging " 'the fact that she should be required to pay $596,000 instead of one-half of the actual appraised value of the property and business.' " (*Id.* at p. 85.)

The appellate court reversed, because the auction delegated the judicial responsibility "to fix the fair market value of the community estate where assets are not divided in kind." (*In re Marriage of Cream, supra,* 13 Cal.App.4th at p. 88, citing *In re Marriage of Knickerbocker* (1974) 43 Cal.App.3d 1039, 1047-1048 [118 Cal.Rptr. 232].) That delegation was unauthorized by the pertinent statutes and rules. (*Cream, supra,* 13 Cal.App.4th at p. 88.) In particular, the court noted that an auction price would not necessarily correspond with the fair market value of any given marketable asset; further, some assets which are not marketable still may have to be valued for purposes of the division of the community estate. (See *id.* at p. 89.) Hence, despite having some good things to say about auctions and other kinds of innovative ways of dividing up community assets later on in the opinion (see *id.* at pp. 89-92), such a method could not be used without a stipulation of the parties.

*Cream* is helpful for our purposes here because it illustrates that the division of a community estate is not a simplistic "sale" of *individual* assets, asset by asset, but an equal division of the whole of a community *estate.* The court recounted the means by which a court may divide the community estate, including in-kind, asset distribution or cash out, sale and division, or even simple conversion to tenancy in common. (See 13 Cal.App.4th at p. 88.) At the conclusion of the opinion the court expanded the list to include methods of division of the community estate which the parties could use by themselves if they were agreeable. (See *id.* at pp. 94-95.) Such methods include piece-of-cake division (one side makes up two lists of the community property, the other gets to pick which list to take),[10] one-values, one-chooses (one spouse puts the values on the property, the other chooses which items he or she will take at the stated value up to one-half the total), and you-take-it-or-I-will-take-it (one party places a value on an asset at which he or she is willing to either let the other take the asset or be awarded it if not taken).

Thus it is not accurate to characterize a division of the community estate pursuant to a marital settlement agreement as a "sale" in the sense

---

[10]Cf. *In re Marriage of Keedy* (1991) 249 Mont. 47 [813 P.2d 442, 444] (baseball card collection split by ordering husband to divide cards into two piles with wife to have choice of which pile to take).

of—to allude to Corporations Code section 25017, subdivision (a)—a *contract* to sell a security. A marital settlement agreement is a contract to divide up the whole of a community *estate*—and often to resolve other legal obligations as well—not a contract to sell a particular item of stock *qua* "security."[11]

---

[11]The tax angle on the issue before us is interesting, but not dispositive. The rule in federal tax law is that an equal division of community property is not a taxable event. (E.g., *Siewart* v. *C.I.R.* (1979) 72 T.C. 326, 332-333 ["Where divorcing spouses in community property States make an approximately equal division of the entire community property, the partition is nontaxable, and the basis of the property set aside to each spouse is its basis to the community prior to the division."]; cf. *In re Marriage of Brigden, supra,* 80 Cal.App.3d at p. 395 ["The division of community property between the parties is not a taxable event."].) On the other hand, a divorce settlement *can* result in a taxable event when one spouse receives significant assets from *outside* the community. (*Siewart, supra,* 72 T.C. at p. 333 ["Where one spouse receives property having an aggregate value equal to substantially more than half the value of the entire community property, the transaction is a taxable one and a basis adjustment may be required."]; *Showalter* v. *C.I.R.*, T.C.M. (CCH 1974) 1974-040 ["if as a result of the dissolution of the marital community one spouse receives a consideration from outside of the community assets in exchange for a transfer of vested property rights previously owned by the community, it is indicative that a transaction tantamount to a sale has occurred and gain or loss, if any, will be recognized."].)

Because of the rule that the introduction of property from outside the community can make for a taxable sale, some federal courts have said that to the " 'extent . . . that one party receives [pursuant to a divorce decree] separate cash or other separate property, rather than community assets, in exchange for portions of his community property, he has sold or exchanged such portions and gain, if any must be recognized thereon.' " (*Carrieres* v. *C.I.R.* (9th Cir. 1977) 552 F.2d 1350, 1351, quoting from the tax court opinion in same case, *Carrieres* v. *Commissioner of Internal Revenue* (1975) 64 T.C. No. 91, p. 12.)

We do not think that a per se rule should be extracted from the federal tax cases that there is a "sale" whenever a spouse gives a note for a balance of community property, while no "sale" results when existing community assets are used to offset the balance. The great rule in tax law is that substance takes precedence over form, a rule which usually works to the benefit of the tax collector. When substantial new wealth is brought into a marital settlement, that may indeed be an indicator that the transaction involves "something more than a mere division of property." (See *Johnson* v. *United States* (9th Cir. 1943) 135 F.2d 125, 130.) There is no reason, after all, why a couple could not engage in what is, in essence, a *collateral* transaction involving their separate property at the same time they are divvying up their community estate. So in that context it makes sense to call the transaction a "sale." On the other hand, the mere giving of a note to offset a community balance is not truly a collateral transaction, apart from the division of community property. Consider the case of a couple whose *only* community asset is the ownership of a professional practice, and that asset is community. If there is a divorce, a note may be the only way of equalizing the community estate, but to call the giving of that note a "sale" of the practice is unreasonable. The only new wealth involved is the one spouse's hope that he or she can make enough from the practice to offset what the community property laws impose as an obligation in the wake of the breakup of the marriage. The only "sale" is one which is, in effect, imposed by the law of community property in the first place. That is a considerably different scenario from one, for example, where a spouse, during a divorce settlement, throws in some old shares of IBM inherited from her grandfather in return for some additional separate property cash from her soon-to-be ex-husband. In the present case, it is clear that the facts are much closer to the former scenario

Indeed, the idea that community property asset allocations should be treated as sales for purposes of state securities laws quickly reduces to absurdity. For example, it would mean that there would be a "sale" of stock, with all the ramifications such a conclusion carries, in the case of the simplest dissolution, where the community assets consisted only of an incorporated family business and a car. If one spouse got the car, and the other the business, that would be a "sale" under Sally's theory. In fact, as Sally's counsel indicated at oral argument, even a case where stock in a small family business was simply divided in half could be considered a "sale" subject to the state securities laws. If our Legislature had really intended such farfetched results, it would have made its intent plain.

■ In the present case, everything about the transaction at issue here was connected to the marital relationship of the parties and the need to find a way to divide the community estate. Sally's interest in the stock in the first place was the result of the operation of California's community property laws, not any *contract* she entered into to buy the stock. The reason for the marital settlement agreement was the dissolution of the parties' marriage. Most importantly, the only reason that Sally can even possibly surmount the reasonable reliance barrier for any sort of fraud claim—including extrinsic fraud in the family law context—is the special solicitude *family law*, under the extrinsic-intrinsic fraud doctrine, affords to spouses who are induced not to conduct independent appraisals of community assets. (E.g., *Vai* v. *Bank of America supra*, 56 Cal.2d at pp. 337-342.) After all, she had two lawyers, both of whom advised her to obtain an independent appraisal. And a newspaper article had made her aware of the possibility of Vans being worth more than Serge said. Calling the marital settlement agreement here a sale of "stock" does not accord with the substance of the transaction.

### 2. Application of Securities Law to Marital Settlement Agreements Is Without Legal Foundation

We must add that the application of securities law to marital settlement agreements is unprecedented in California law. Of course, not every proposition of law that is unprecedented is necessarily wrong or invalid. The common law constantly confronts new situations, requiring new applications of old rules, or sometimes the articulation of new ones. (See *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 394 [115 Cal.Rptr. 765, 525 P.2d 669]; *People* v. *Pierce* (1964) 61 Cal.2d 879, 882 [40 Cal.Rptr. 845, 395 P.2d 893]; *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 719-720 [254 Cal.Rptr. 211, 765 P.2d 373] (dis. opn. of Kaufman, J.); cf.

than the latter. The parties faced the classic problem of what to do with a community owned business, not a collateral transaction involving separate property.

Cal. Rules of Court, rule 976(b)(1) [standards for publication include establishment of a "new rule of law"]; Code Civ. Proc., § 128.7, subd. (b)(2) [allows claim or defense to be asserted by "nonfrivolous argument for the . . . establishment of new law"].)

But other times the absence of precedent ought to give lawyers and judges a clue that they are on the wrong track. Here, it is strange that in family law's well-trodden country involving extrinsic and intrinsic fraud, no case up to now has tried to apply the securities laws as a remedy.[12] *Nobody has thought to apply securities fraud laws to marital settlement agreements because the substance of a marital settlement agreement is not a stock sale.* It is, rather, a means by which two human beings untangle a family relationship and allocate, as between themselves, community assets.

Sally points to *Spector* v. *L Q Motor Inns, Inc.* (5th Cir. 1975) 517 F.2d 278, which did apply federal securities law to a transaction closely connected with a marital settlement agreement. In *Spector,* the husband was issued, as part of a marital settlement agreement, a certificate for 18 shares of stock in a motel chain owned by his wife and her family. Upon the husband's receiving the shares, the corporation and the husband entered into a stock purchase agreement obliging the husband to sell those shares for $70,000 cash and a note for $300,000. Little did he know that there were plans for the company to go public, which would make his stock, if he held on to it, worth much more. Against the company's challenge to jurisdiction, the Fifth Circuit observed that the transaction could be properly "label[ed]" as a "sale," saying to do so would require no "strained construction" of that term. (See *id.* at p. 285; see also *id.* at p. 284 ["That a sale of securities was alleged and can be proved . . . cannot be realistically disputed here."].)

*Spector* is of very limited value because it never confronted the question of whether the substance of a *marital* settlement agreement involving community property stock may be reasonably construed to include a "sale" of stock for purposes of state securities laws.[13] However, even if it did somehow stand for the idea that the award of community stock pursuant to a

---

[12]The present case is somewhat similar to *In re Marriage of Brennan* (1981) 124 Cal.App.3d 598 [177 Cal.Rptr. 520], in which a husband told his wife that the shares in the family business were " 'worthless,' " that he was going to be " 'over fair' " with her, and advised her not to hire a lawyer, but rather " 'Go along with me and you won't be sorry.' " (*Id.* at pp. 600-601.) As it turned out, the stock was later considered to be worth a minimum of $250,000. (*Id.* at p. 602.) The appellate court held that because extrinsic fraud existed, the wife's subsequent motion to set aside the judgment should have been granted. (See *id.* at pp. 603-607.)

[13]After all, had the case involved a *state* securities claim, the court might have confronted the problem of reconciling the state securities laws with a parallel body of law concerning marital property.

marital settlement agreement was a "sale" for purposes of Texas state securities law, we would respectfully decline to follow it. Securities laws have been enacted to protect genuine investment decisions, not forced allocations of community assets.

Despite the gaping absence of any application of securities fraud law to marital settlements, the issue of spousal disclosure generally has certainly not escaped the notice of the Legislature. (See *In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1437-1441 [28 Cal.Rptr.2d 726] [discussing impact of certain amendments to former Civil Code sections 5125 and 5125.1].)[14] In light of the fact that the substance of marital settlement agreements is not one of the individual sale of the community assets involved, and of the total absence of any precedent for the application of state securities fraud laws to divisions of community property, it should be obvious that any such application is up to the Legislature, not the courts. If the Legislature wants to further complicate dissolutions and make them more cumbersome and expensive by opening the door in many divorce cases to future securities litigation, then so be it.[15] But that bad idea should not be accomplished by judicial fiat.

Sally also argues that there are several California cases which, while they do not involve the application of securities law per se, allow for tort damages to parties "defrauded" in marital settlement agreements which are not merged in a judgment of dissolution. Those cases, however, do not really stand for such a broad proposition.

*Howarth* v. *Howarth* (1947) 81 Cal.App.2d 266 [183 P.2d 670] merely said that a nonincorporated property settlement agreement could be enforced as a contract, and affirmed a judgment in favor of a wife for amounts due under it. *Fowler* v. *Fowler* (1964) 227 Cal.App.2d 741 [39 Cal.Rptr. 101], like *In re Marriage of McNeill* (1984) 160 Cal.App.3d 548 [206 Cal.Rptr.

[14]While *Rueling* does not deal with the precise problem before us, it does present an interesting twist on the problem of the allocation of stock, and shows why applying state marital disclosure standards to securities matters may have undesired and unintended consequences. In *Reuling*, the divorcing couple owned certain stock and stock options. The husband was an insider of the corporation, and the wife contended that he had a duty to disclose certain information, so she could have sold her share of the stock before it declined in value. The Court of Appeal pointed out that federal securities laws trump any state-imposed disclosure requirements, so the husband had not only *no* duty of disclosure, but any disclosure would have violated federal insider trading laws. (See 23 Cal.App.4th at pp. 1435-1436.)

[15]The present case differs from many only in the size of the community business involved. Maybe Serge and Sally are so rich that it does not seem anomalous to apply securities law to their divorce, but the same cannot be said for many couples who own small incorporated businesses.

641],[16] dealt with torts committed by one spouse against the other *independent* of the spouse's fiduciary duties of disclosure imposed in connection with the very process of marital dissolution itself. In neither case did the torts involved necessarily depend for their very existence on the special fiduciary duties imposed on spouses by the substantive family law.[17]

Neither *Wilcox* v. *Wilcox* (1971) 21 Cal.App.3d 457 [98 Cal.Rptr. 319] nor *Zastrow* v. *Zastrow* (1976) 61 Cal.App.3d 710 [132 Cal.Rptr. 536] involved situations dealing with fiduciary duties of disclosure in connection with the dissolution process. *Wilcox* merely held that a husband could sue his wife for the return of some community property money over which, back then, the law gave him management and control. *Zastrow* was a statute of limitations case, where the court held that a complaint to cancel a property settlement agreement was subject to a four-year statute of limitations because the ground for relief was the wife's incompetence.

The case which comes closest to supporting Sally's position is *Worton* v. *Worton* (1991) 234 Cal.App.3d 1638 [286 Cal.Rptr. 410], but even that falls short. In *Worton* an ex-wife sued her former husband for fraud and conversion arising out of misrepresentations he made about his pension plan. She also sued her attorney for malpractice. Essentially, the husband's pension plan had about $162,000 more in it than he said, because it was "overfunded." As a result, while the judgment divided the plan in kind, a month after the judgment was entered the *excess* $162,000 was distributed to the husband. The wife sued for her half of the $162,000 on fraud and conversion theories. The case came up to the Court of Appeal on summary judgment. The sole issue considered in the opinion regarding the husband (part of the opinion also dealt with the malpractice claim)[18] was whether the action was barred by res judicata. The court said no, using classic extrinsic fraud doctrine language: The husband's "failure to reveal the existence of the excess assets to plaintiff constituted a violation of his fiduciary duty to account to her for the community property and deprived her of an *opportunity fully to present her case* in the dissolution proceeding." (*Id.* at p. 1649,

---

[16]*McNeill* was overruled on another point in *In re Marriage of Fabian* (1986) 41 Cal.3d 440, 451, footnote 13 [224 Cal.Rptr. 333, 715 P.2d 253].

[17]In *Fowler*, a widow was inveigled out of some money on the pretext that her soon-to-be husband needed it to fix up his separate property house and he would put the house in both their names anyway. In *McNeill*, the defrauded spouse was duped into believing that his wife was a premarital judgment debtor, an attorney with a degree in accounting, and also suffering from terminal cancer. In reliance on those false representations, he signed documents which, he was told, put all of the marital assets into a trust, but which, in reality, amounted to a marital settlement agreement transferring to her almost all of his assets, including his separate property house.

[18]Justice Johnson's concurring opinion is devoted to the statute of limitations problem concerning the attorney.

italics added.)[19] Because the excess property had not been litigated, res judicata, which the court styled as " 'issue preclusion' " (see *id.* at p. 1647), obviously did not bar litigation of the claim.

Cases are not authority for propositions which the court did not consider. (*American Federation of Labor* v. *Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1039 [56 Cal.Rptr.2d 109, 920 P.2d 1314]; *Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 372 [20 Cal.Rptr.2d 330, 853 P.2d 496].) The *Worton* court never considered the legal propriety of a tort claim based on the concealment of a community asset, as distinct from a traditional set aside action based on extrinsic fraud. It merely held that a tort claim based on extrinsic fraud is not barred by res judicata. That did not establish that the wife should have had an independent tort action for damages, as distinct from a right to set aside the judgment.

Moreover, even if *Worton* could somehow serve as authority for the broad proposition that an independent tort action may be brought anytime there is extrinsic fraud committed in the course of a family law dissolution, it still would not help Sally in *this* case. The violations of fiduciary duty on which the trial court predicated its judgment in the case before us (unlike *Worton*) did not involve the actual *concealment* of community property, but merely represented, in words which Justice King used to describe *intrinsic* fraud in *Stevenot*, a "position favorable to [Serge] as to the . . . valuation of assets." (*In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1070.)

Amicus curiae argues that it would violate equal protection to "deny" a spouse recovery under Corporations Code section 25402, which provides the remedy for securities fraud. The flaw in the argument is that it assumes that spousal claims for securities fraud are substantively identical with other kinds of claims for securities fraud.

*Not necessarily.* We agree that to preclude a spouse from recovering under Corporations Code section 25402 *merely* by virtue of his or her status as a spouse when he or she would *otherwise* have a valid claim under section 25402 would indeed be a denial of equal protection based on spousal status. What amicus curiae forgets, however, is that the only reason the spouse in

---

[19]As Justice King pointed out in *Stevenot,* concealment of the existence of community property is extrinsic, as distinct from intrinsic, fraud. (*In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1069.) In *Worton,* the nature of the defendant husband's representations amounted to extrinsic fraud, as he had, in effect, concealed the very existence of the $162,000. Had he merely misrepresented the value of the fund *qua* value, the fraud would have been intrinsic. (See *id.* at p. 1070.)

this case has a claim under section 25402 in the first place is because of duties of disclosure *imposed on spouses qua spouses* under the Family Code.

In other words, Sally predicated her lawsuit on the very fact that she was owed *special* duties of disclosure because of her status as a spouse. (See Fam. Code, § 1100.) It is hardly a denial of equal protection to hold that her status as a spouse should not afford her a special *benefit*, not otherwise available to a Corporations Code section 25402 litigant. As we have already indicated, if Serge had sold Sally some worthless stock—the prototypical stock fraud—then their status as spouses would not preclude her from recovering. That is not this case. Sally wants the special benefits of disclosure which come with being a spouse. And she wants them in a transaction that would not have taken place except that it was required by the Family Code. But she does not want the confines of the traditional family law remedy.

The parties have also invited us to determine whether California's securities laws apply to private, as well as public, transactions. We decline the invitation. That determination should be left for a genuine securities fraud case. Securities laws are intended to protect investors, not divorcing spouses. For the moment it is enough to hold that California's securities laws most assuredly do not apply to agreements between husband and wife dividing community property.

## B. *Other Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. CONCLUSION AND DISPOSITION

Obviously, nothing we say in this opinion is intended to countenance any kind of fraud, intrinsic, extrinsic, constructive, securities, or otherwise. But when the fraud claim is predicated on misrepresentations of value of community stock made in the process of dissolution, the remedy is the traditional one of timely seeking to set aside the judgment or marital settlement agreement in the appropriate forum, not a securities fraud suit.

The judgment is reversed as to the damages awarded for Sally's first and fifth causes of action, and the cause remanded for entry of a new judgment

---

*See footnote, *ante*, page 415.

to the effect that Sally shall take nothing by way of those causes of action. The judgment is affirmed so far as it awards Sally damages on the second, third, and fourth causes of action. In the interests of justice both parties will bear their own costs on appeal.

Crosby, J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied November 14, 1997, and the opinion was modified to read as printed above.